## JOSEPH WEYMAN

*v.*

## HENRY C. THOMPSON, JACOB WILSON, JAMES L. KEMBLE et al.

1. When executors exhibit for settlement a joint account, and when, by the decree of an orphans court, such account is finally settled and allowed, the executors are jointly charged with the balance thus ascertained to be in their hands. The decree is in the nature of a judgment.

2. In such case each executor is liable for the safe preservation of the funds which make up the balance with which they are charged.

3. When the enforcement of liability under an account, which, on its face, purports to be joint, is sought, it may be shown that, in fact, the account was the separate account of one or more of the apparent accountants.

4. Where, however, in absence of fraud or mistake, executors who do not control the funds of an estate, voluntarily join in the account of the executor who controls those funds, and thereby charge themselves with the whole estate, they will be held liable because of their admission *in judicio*, and the judicial sentence pronounced thereon.

5. More emphatically will this be so held in this court, when it is made to appear that those who thus voluntarily join in the account have been negligent of their duties to the detriment of the estate, against the warnings of a beneficiary of the estate whose apprehensions were not satisfied until such joint accounting was had.

---

*Mr. Clarence T. Atkinson* and *Mr. Mark R. Sooy*, for the complainant.

*Mr. Joseph H. Gaskill*, for the defendant Jacob Wilson.

*Mr. Charles E. Hendrickson*, for the defendants Kemble and The Monument Cemetery Association.

THE CHANCELLOR.

Christian Weyman, of Beverly, in Burlington county, died on the 26th of May, 1882, having made his will on the 14th of February, 1879, and a codicil to it on the 27th of May in the same year.

By the will he appointed the defendants Henry C. Thompson, Jacob Wilson and James L. Kemble its executors, directing that they should not be required to give security.

The will was drawn by James L. Kemble, one of the executors, who for more than thirty years had been a justice of the peace in Burlington county.

Henry C. Thompson, another of the executors, was a lawyer in Philadelphia, who, when the will was made, and until the year 1890, was reputed to be of considerable wealth and of undoubted integrity and ability. He was prominently connected with the management of two trust companies, and was also executor or trustee of several estates. His residence was in Philadelphia, but he had a summer home on the Delaware river at Beverly. For several years before Mr. Weyman's death he was Mr. Weyman's legal adviser and business agent, attending to his investments and the collection of the income therefrom, and rendering such legal assistance as from time to time was required of him. When Mr. Weyman died all his securities and valuable papers were in Mr. Thompson's possession.

Jacob Wilson, the third executor, was the treasurer of a church board of education. He resided in Beverly and attended daily to his business in the city of Philadelphia. The acquaintance and friendship between him and Mr. Weyman originated in their mutual interest in Sunday school matters. He was frequently the messenger between Mr. Thompson at Philadelphia and Mr. Weyman in Beverly, and understood that for a long time Mr. Thompson had been Mr. Weyman's legal adviser.

The testator left his widow and one son, his only child, surviving him. That son, Joseph Weyman, is the complainant.

The will provided, that immediately after the testator's death $100 should be paid to his son and $200 should be paid to his widow; that the executors should set apart $10,000, invest it, and hold the investments in trust, and pay the income therefrom to his widow for her life; that the widow should also, during her life, have the use of a certain house with some land adjoining it; that such provisions should be in lieu of her dower in his real estate; that upon her death the use of the house and land, given to her

for life, should go to his son for the son's life; that the testator's household furniture should go to his son; that $10,000 should be held in trust by the executors of the will, and the income thereof paid to the son for his life, and, upon his death, the principal should be divided and paid among his issue, and, in default of such issue, to certain persons who were named in the will; that certain real estate should go to the Methodist and Baptist churches of Beverly when the testator's widow should die; that $500 should be paid to Phoebe Rihl and $500 to Louise Osman, and $500 to the wife of Lewis Weyman, subject, however, to there being sufficient estate to provide the two trust funds of $10,000 each, to be invested and held for the widow and son; that certain lots in the Beverly Monument Cemetery, except six, which were reserved for the testator's own burial plot, should go to the cemetery and be sold by it to raise a fund which should be held in trust and the income therefrom forever devoted to the care of the testator's burial plot and the avenue's of the cemetery; that upon the death of his widow $3,000 should be expended to put a wall of specified dimensions and character in front of the cemetery, and that the residue of the testator's estate should be divided between the Old Man's Home and the Penn Asylum for Indigent Women, in Philadelphia, upon indicated trusts.

On the day when the testator died, as Mr. Wilson arrived in the evening from Philadelphia, he was notified of the death, and, after conference with Mr. Thompson, he arranged the details of the funeral. He had then heard that he was an executor of the will of Mr. Weyman. About that time, also, he took possession of $400 of Mr. Weyman's money and expended it in paying the wages of the decedent's nurses, the expenses of the funeral, and the legacies of $100 and $200 respectively to the complainant, Joseph Weyman, and his mother. He paid out more than the $400, and was reimbursed the excess in his payment by Mr. Thompson from funds of Mr. Weyman that Mr. Thompson then controlled.

After those payments had been made the will was proved before the surrogate of Burlington county, all three of the executors joining in the written application for probate and in the usual

executor's oath when probate was granted.    Letters testamentary were issued to all three of them.

Mr. Wilson testifies that it was not his wish to qualify as an executor, but that he was induced to do so by Mr. Thompson, who assured him that he should not be troubled with the management of the estate.    It is noted, however, that there is no evidence that the reluctance, which Mr. Wilson now asserts, was expressed by him to any beneficiary under the will prior to the present emergency.

After the probate of the will and the qualification of the executors, neither Mr. Kemble nor Mr. Wilson made any examination of the assets of the estate, or any inquiry of Mr. Thompson with reference to them, nor did they engage in the management of the estate.    Mr. Thompson retained possession of the assets and dealt with them without any hindrance from his co-executors, or inquiry by them as to the course of his conduct.    All that Messrs. Kemble and Wilson did with reference to the trust they had assumed appears by their own testimony.

At one time Mr. Kemble, by appointment with Thompson, went to Thompson's office in Philadelphia for the purpose of assisting to prepare an inventory of the assets.    He met Mr. Thompson there with a bundle of papers before him, apparently engaged in an examination into Mr. Weyman's affairs. Mr. Wilson was not there, and giving Wilson's absence as reason, Mr. Thompson stated that nothing could be done that day.    Mr. Wilson testifies that he had not been notified of the meeting.    It does not appear that either Mr. Kemble or Mr. Wilson sought another meeting with reference to an inventory.

At another time, which is not given, Mr. Kemble received a letter in behalf of the Old Man's Home, one of the residuary legatees, asking for payment of the legacy to that institution, and in response to it, called upon Mr. Thompson and urged him to pay the legacy.

At another time, or at other times, other legatees applied to Mr. Kemble for payment, and he went to Mr. Thompson to see if they could not be paid, but failed to obtain any satisfaction.

Mr. Kemble testifies that three weeks after the death of the testator, Joseph Weyman applied to him for payment of income to which he was entitled, and that he, Kemble, then told Joseph that Mr. Thompson had all the assets of the estate. Once, after Joseph Weyman had importuned Kemble for money, Kemble saw Thompson and urged the sale of some land, and Thompson replied that the land could not be sold to advantage.

Mr. Wilson appears to have had such unlimited confidence in Mr. Thompson's integrity that he took Thompson's personal assurance upon every subject without question. He says that he qualified as executor after an understanding with Mr. Thompson that his doing so was mere form, and that he would be relieved from the trouble of managing the estate. He frequently told the complainant, when the complainant importuned him for money, that he had nothing to do with the estate; that it was in the hands of Mr. Thompson. At the same time he more than once spoke to Thompson about the complainant's demands, and yet he never asked Thompson as to the condition of the estate, or took any steps to ascertain that condition. This inaction upon his part was in face of the fact that he knew that the complainant's constant arraignments of Thompson for failure to pay him his income, and Thompson's surprising submission to those arraignments, was a matter of common talk.

In April, 1884, nearly two years after the probate, the three executors, at the instance of the complainant, were cited to file their inventory and account. It appears by the testimony of a constable that they were personally served with citations. Mr. Kemble, immediately after being served, went to Mount Holly, the county seat, and stated to the complainant's lawyer there that he had no control of the estate, and knew nothing about it. Mr. Wilson testifies that he was not served with the citation, but that it was left at his house and was not handed to him until after the commencement of this suit. Mr. Thompson evidently received the citation designed for him, for he prepared an inventory and account, and signed them and caused them to be signed by his co-executors. He alone, however, swore to their truth.

Weyman *v.* Thompson.

The inventory was as follows:

"Inventory and appraisement of the goods and chattels, rights, credits and effects of Christian Weyman, late of the township of Beverly, in the county of Burlington and State of New Jersey, deceased, made by Henry C. Thompson, Jacob Wilson and James L. Kemble, executors of the last will and testament of said deceased and Alfred L. Carey and Henry C. Thompson Junior, appraisers.

| | | |
|---|---:|---|
| 1. Bond and mortgage of H. B. Holbrock, dated October 1872 payable one year with lawful int. on house and lot, Broad St., Beverly........................................................................ | $1,200 | 00 |
| 2. Do of H. B. Holbroock, dated March 1873 payable in one year with lawful int. on house and lot Broad St. Beverly.. | 1,000 | 00 |
| 3. Bond and mortgage Anna Scattergood, dated 15 May, 1865, payable five years with interest and taxes, house and lot in Beverly, River Bank.................................................... | 2,000 | 00 |
| 4. Do Joseph Weyman, dated Feby. 1872, payable in one year with lawful interest, house, Bridgeboro Road.................. | 200 | 00 |
| 5. Do Albert S. Kelly, et al, dated Oct. 1869, payable in five years with interest, Cooper St. Beverly........................... | 500 | 00 |
| 6. Do Elwood Wilson dated 19 August 1874 payable in one year with int. prem. James St. Phila.............................. | 5,000 | 00 |
| 7. Bond and Mortg. Elwood Wilson, dated 7 May, 1872 payable in one year, int, Prems. Second St. Phila........................ | 3,000 | 00 |
| 8. Do. John G. Murphy, dated August 19. 1874, payable in five years with int. prems. Venay St., Phila........................... | 4,270 | 00 |
| 9. Cash on deposit in Fidelity T. Co..................................... | 874 | 50 |
| 10. Cash in house of decedent at time of decd........................ | 400 | 00 |
| Total....................................................................... | $18,444 | 50." |

The account was filed at the same time and was entitled:

"The account of Henry C. Thompson, Jacob Wilson and James L. Kemble, executors of the last will and testament of Christina Weyman, late of the township of Beverly, in the county of Burlington and State of New Jersey, deceased, as well of and for the estate which hath come into their hands to be administered as for their payments and disbursements out of the same."

By it the accountants charged themselves with the amount of the inventory $18,444.50, and prayed allowance for payments amounting to $1,629.61, including therein the payment of the two legacies of $100 and $200, respectively, the cost of ancilliary letters to Mr. Thompson, in Philadelphia, and commissions on

$18,444.50, at the highest rate allowed by law. The account exhibited a balance, "in the hands of the accountants," amounting to $16,814.89. The account was signed, as has been stated, by all the executors, but was verified by the oath of Mr. Thompson alone, which does not appear to have been subscribed by him.

To this account Joseph Weyman filed exceptions on the ground that the executors did not account for income received, or for receipts from the sale of real estate. The exceptions were filed on the 15th of July, 1884, but nothing was done under them until the 13th of May, 1885, when, by consent of the exceptant's proctor, they were withdrawn, and, thereafter, during the succeeding September term of the orphans court, the account was duly allowed by that court's decree.

Mr. Wilson states, with reference to his signature to this account, that Thompson brought it to him one day as he was preparing to leave his place of business, and requested him to sign it; and that he then told Mr. Thompson that he knew nothing of it, and that if he signed it he would do so upon Mr. Thompson's representations, to which Thompson replied that he would be responsible for the whole thing; that it was a mere matter of form; that he needed Wilson's signature; that the complainant had a lawyer at Mount Holly and was bothering him, and that this would settle the account and would relieve Wilson from responsibility. Upon this representation, Mr. Wilson claims to have signed the account without understanding its contents or its legal effect.

Mr. Kemble says, upon his part, that the account was mailed to him, and that he signed it and returned it to Mr. Thompson. He states that when he signed it he could not help himself; that he did not consider himself worthy to stand up before a lawyer, a man of education, and that when he signed the account he did not know where the assets were and did not inquire.

After the accounting, matters remained as they had existed before it. Joseph Weyman constantly complained that his interest was not paid to him, and Kemble and Wilson remained indifferent to the affairs of the estate. Mr. Wilson asserts that he assumed that he was discharged by the accounting. In the

·early winter of 1890, the executors were again, at the instance of the complainant, cited to account, and in April of that year ·Mr. Thompson, alone, accounted, as "acting trustee," for income ·only, charging himself with the interest on $10,000, from 1882 to the end of 1889, and praying allowance for sundry sums paid to Joseph Weyman, from time to time, amounting in the aggregate, together with the trustee's commissions charged at the highest legal rate, to $4,532.50, which, deducted from the income received, exhibited the balance in his hands at $280.23. Mr. Kemble says that when he was cited in 1890, he called upon the complainant's lawyer and stated that he had no assets of the ·estate. Mr. Wilson states that before the citation was received, Mr. Thompson sent word to him that he would probably receive a notice, but that he, Thompson, would settle the whole thing, and that the estate would be done with. He said that the complainant was troubling him again, but that the whole matter was fixed up, and that he, Wilson, need give himself no trouble about it. Mr. Wilson says that this statement satisfied him, so that when the citation was served he did not ask any questions about the estate.

While the account of 1890 remained unsettled, in July of 1890, Mr. Thompson went to Jersey City and there attempted to commit suicide, but failed. Since that time he has not been heard of, and his whereabouts are now unknown.

In 1881, Christian Weyman owned a house and lot on Second street, Philadelphia, used for business purposes, which was subject to an annual ground rent of $420 that could be satisfied by the payment of $7,000, and in June of that year he placed $7,420 in the hands of Mr. Thompson to pay the current year's ground rent and satisfy the ground rent for the future. Mr. Thompson did not satisfy the ground rent for the future and relieve the property of its charge. Consequently, after Mr. Weyman's death, the property was sold because of the non-payment of current ground rent, although it was then yielding about $1,200 a year to the estate. It had cost Mr. Weyman about $20,000. It realized at the sale $1,000.

It also appears that Mr. Thompson alone proved the will in Pennsylvania, and that on the 14th of March, 1883, he sold the $5,000 mortgage made by Elwood Wilson, which appears in the inventory, and converted the moneys realized from that sale to his own use, and, on the 25th of June in the same year, sold the Murphy mortgage, appearing in the inventory, for $4,270, and, on the 24th of February in the same year, received payment of the Elwood Wilson mortgage for $3,000, and satisfied that mortgage of record. It must be noted that it was after these assignments and satisfaction that the mortgages were inventoried as existing securities. Of the mortgages inventoried, all that now remain are the mortgage given by Scattergood for $2,000 and the mortgage given by Joseph Weyman for $200. In addition to these two mortgages there appears to be a mortgage for $800, given by one Smith to the three executors as trustees under Mr. Weyman's will, in June, 1890, and a mortgage of $600 assigned by Joseph Weyman to the three executors. The remaining assets have not been traced.

The widow of the testator died on the 20th of January, 1888, and thereafter Mr. Thompson paid to the Beverly Monument Cemetery, in several payments, $3,094.12, on account of the wall that was erected in front of the cemetery. All these payments were made in the year 1888.

It appears also that Mr. Thompson made several payments to the Old Man's Home and the Penn Asylum for Indigent Females, aggregating $950 to the Old Man's Home and $927.97 to the Penn asylum. The payments to these two institutions were made between the year 1884 and the year 1890. On the 3d of February, 1885, he paid Louise Osman $551 in satisfaction of her legacy, and, on the 14th of the same month, paid a like amount in satisfaction of the legacy to Elizabeth, the wife of Lewis Weyman, and, at another time, not stated, paid $475 to Phoebe Rihl. No other payments by him have been traced.

The payments of income to the complainant were invariably made by the individual checks of Mr. Thompson, drawn upon different banks of Philadelphia, and, although they exhibited to the complainant that his income was kept in Mr. Thompson's

individual bank accounts, the complainant made no objection or protest.

It appears that at one time the complainant took one of these checks to Mr. Wilson, who gave him the cash for it, and thereby became aware that Mr. Thompson was mixing at least the income of the trust moneys with his own moneys in his individual bank account.

It is very clear that if Messrs. Kemble and Wilson had examined into the condition of Mr. Weyman's estate, when they qualified as executors, they would have discovered Mr. Thompson's receipt for the $7,420 paid to him in 1881 to satisfy the ground rent charged upon the property in Philadelphia, and that that discovery would naturally have led them to inquiries which would have precluded their subsequent confidence in him, and that if, when the inventory and account of 1884 were presented for their signatures, they had demanded inspection of the assets with which they were about to charge themselves, at least, the non-existence of the three mortgages that had been disposed of in 1883 would have appeared.

Upon both these occasions their attention was plainly directed to their duty. Upon the first of them they were fresh from a solemn oath that bound them to an expressly defined course of conduct, which could not be pursued without accurate knowledge of the estate, and on the second occasion they were sharply reminded by citation of a neglected duty and a violated oath. They were then most plainly made aware that the man in whom they had reposed confidence was negligent and unmindful of that which he had sworn to do. Then came repeated complaints from a beneficiary of the trust that he was not paid. It is true that those complaints lost force because they most frequently were from the lips of a drunken man, yet Mr. Thompson's submission to them awakened a suspicion which even the common talk of the street did not disregard. Added to these particulars, in the case of Mr. Kemble, was the circumstance that other legatees complained that the will was not executed, and, in the case of Mr. Wilson, the fact that he cashed a check which exhibited

2

an intermingling of trust funds with private moneys of Mr. Thompson.

Messrs. Kemble and Wilson, in their defence, insist, in the first place, that the complainant, by acquiescence in Thompson's exclusive management of the estate and delay in seeking the enforcement of his rights, has lost his claim upon the assistance of a court of equity; and, in the second place, that they have not been guilty of that gross negligence or supine indifference which must exist to render them liable for the complainant's loss.

Pausing for a moment before discussing the questions presented by this insistment, I will consider the effect of the joint accounting by the executors. By their account they charge themselves jointly with the amount of the inventory, and they discharge themselves of only a fractional part of that amount.

" The law is well settled in this state," said Chancellor Williamson, in *Laroe* v. *Douglass, 2 Beas. 308, 310,* " that when executors exhibit for settlement a joint account, and when by the decree of the orphans court such account is finally settled and allowed, the executors are jointly charged with the balance thus ascertained to be in their hands. The decree is in the nature of a judgment."

It follows that in such a case parties interested may rely upon the decree and need not inquire which of the executors has custody of the funds which constitute the balance. They are each and all liable for the safe preservation of them. This rule is well settled in this state. *Bellerjeau* v. *Executors of Kotts, 1 South. 358; Fennimore* v. *Fennimore, 2 Gr. Ch. 292; Schenck* v. *Schenck, 1 C. E. Gr. 174; Suydam* v. *Bastedo, 13 Stew. Eq. 433; English* v. *Newell, 15 Stew. Eq. 76; S. C. on appeal, 16 Stew. Eq. 295; Tehan* v. *Maloy, 18 Stew. Eq. 68.*

But it is also established that it may be shown, when the enforcement of the liability under the account, which purports on its face to be joint, is sought, that the account in fact was a separate and not a joint one. In *Fennimore* v. *Fennimore, supra,* Chancellor Vroom said : " It has been decided in this court in more than one case, that where executors account jointly, without specifying the amount of receipts and disbursements by each,

.and showing the balance in each one's hands, they are all con-cluded and bound. The decisions rest on the principle that the decree of the orphans court upon a final settlement is in the na-ture of a judgment, and that after such judgment the parties can-not be permitted to set up any matter in avoidance of its opera-tion. Such was the decree in this court in the case of *Philemon Dunn et al.* v. *The Executors of Gretchendun,* deceased, in April Term, 1829. The decree, however, was subsequently reversed in the court of appeals in the last resort, and upon that point, and the reversal was calculated to unsettle the course of decision on this important question." In that case the account was in two parts; the first part stated a general account of all receipts and disbursements, and the second part stated the particular re-ceipts and disbursements of each executor, and the chancellor thought that the object of such double statement was to show the amount of assets in the hands of each executor, and to have their separate liabilities adjusted and sanctioned by judicial authority, and it was therefore considered as separate accountings.

In *Beatty* v. *The Trustees of Cory Universalist Society, 12 Stew. Eq. 452,* four executors accounted, charging themselves with face value of uncollected securities as good. The account appeared on its face to be joint, and crediting all legacies as paid, exhibited a balance in the hands of the executors. The chancellor held that the executors were bound by the account and must answer for the full value that it represented to be in their hands. He, however, considered testimony designed to show that they had not all taken part in the accounting, and held that it did not establish that fact. Upon appeal, *14 Stew. Eq. 563,* the chan-cellor's decree was reversed, the court of appeals holding that it nowhere appeared in the face of the account that it was final, and that the proofs established that two of the executors made the account, and that they did not consider it to be final, and that the .other two executors were. not cognizant of the accounting. The account. was, therefore, held not to be binding upon any of the executors.

- In *English* v. *Newell, supra,* the two executors were present when the account was made and when it was filed. It purported

to be their joint account, nevertheless it was held both in this court and in the court of errors and appeals, that it might be shown that the account was neither joint nor final, and that one of the executors was not bound by it because he had not controlled or managed any of the assets, and had no account to make.

In *Tehan* v. *Maloy, supra,* two executors filed an account which purported on its face to be joint, and both of them swore to it. It appeared also to be a final account. On suit brought to enforce liability upon the part of both executors, one of them defended, setting up in her answer that her co-executor had controlled all the assets, managed the estate and prepared the account, and that the defending executrix had signed the account merely because she had been requested by her co-executor to do so. The case was presented upon an appeal from a decision of the master overruling testimony offered to prove the allegation set up in defence. The vice-chancellor, Van Fleet, held, that it might be shown that an account which, on its face, appeared to be joint, was, in fact, not joint—that is, that one or more of the executors did not swear to it or participate in having it filed and allowed. But, referring to the situation in that case, the vice-chancellor said: "No fraud is charged in the answer in this case, no mistake is alleged. So far as appears, Mrs. Maloy, in signing and swearing to the account, was not tricked by representations of any kind into doing something which she would not have done if no representations had been made; nor does she even claim or pretend that she acted without comprehending or fully understanding what she was doing. The statement or her answer at this point in substance is, that, with full knowledge that the whole of the estate was in the possession and under the control of her co-executor, she, on the simple request of her co-executor, voluntarily, and without the practice of deceit of any kind, joined with him in the account, charging herself, jointly with him, with the whole estate. With her answer in this form, it is impossible for me to show that none of the testator's securities were ever in her custody or possession. Her liability, according to the well-established rule,

rests not on the fact that the assets were in her possession or under her control at any time she charged herself with them, but solely on the ground that she and her co-executor have jointly charged themselves with them.   Her liability grows out of her admission made in judicio, and the judicial sentence pronounced thereon."

The proofs in the present case clearly show that Mr. Kemble never controlled or managed assets of the Weyman estate, and that he had no account to make, and that, save the receipt and disbursement of $400, as stated heretofore, prior to the proof of the will, Mr. Wilson is in the same situation.   Under the ruling in this state, then, no liability can attach to Messrs. Wilson and Kemble, by reason of the account, except it be through their adoption of it by their signatures.   It was not a final account in the sense that it exhibited the full performance of the executors' work, for it did not show that they had realized enough to set apart the two trust funds.   The performance of their duty, in that respect, required them to sell real estate, so that the investible moneys would amount to at least $20,000. But it was final so far as allowances for their disbursements were concerned, and so far as the ascertainment as of the assets acknowledged thereby to have been received were concerned. It did not charge the accountants with unconverted securities or pray allowance for any part of the inventoried assets unconverted. It charged them with a certain sum of money realized and ready for application to the purposes of the will.   The account was not the last one that the executors must render, but it was a final account within contemplation of the one hundred and eighth section of the Orphans Court act.   Rev. 775; Stevenson's Admr. v. Executor of De Hart, 1 Zab. 70; Pomeroy v. Mills, 10 Stew. Eq. 578, 580.

Upon this account there has been a decree.   The defendant executors are now bound by that accounting as the executrix in Tehan v. Maloy was bound—that is, by reason of their admission in judicio, and the judicial sentence pronounced thereon.

They, however, claim that they did not appreciate the consequence that would attend their act.   Mr. Kemble says that the

paper was sent to him by mail, and that he signed it because he was asked to. He signed it immediately and returned it to Mr. Thompson. He says that he did not like to sign, that he spoke to his wife about it, but, nevertheless, he signed it. He knew what the paper was. He was away from Mr. Thompson and unconstrained. He does not assert that any facts contained in it were misrepresented, or indeed that he was deceived, in any way, into the adoption of it as his account. Mr. Wilson signed in his own office. He says that he signed upon Thompson's assurance that the account was a mere form; that he, Thompson, would be responsible, and that the account would relieve Wilson from responsibility. It is only under leading questions that Mr. Wilson declares that Mr. Thompson said in effect that the account was right. He, however, admits that he cannot give Mr. Thompson's language, and when he attempts to give its substance, he does so disjointedly and vaguely so that, in view of the powerful interest he has in the effect of his testimony, I am constrained to doubt whether he may not, unconsciously perhaps, misunderstand it to his advantage.

I cannot look behind the settlement of an account in the orphans court except on the ground of fraud in its procuration. *Frey* v. *Demarest, 1 C. E. Gr. 239; Voorhees* v. *Voorhees, 3 C. E. Gr. 227; Search* v. *Search, 12 C. E. Gr. 139; Dringer* v. *Receiver Erie Ry. Co., 15 Stew. Eq. 577.* And such fraud should appear by clear and cogent proof. The exhibition of a negligent acquiescence in a false account because of over-weening confidence in the person who prepared it does not show it, and the proofs of the defendants, when fairly weighed, do not amount to, more than this.

I am of opinion that the defendant executors must be jointly charged with the balance found upon their accounting.

I cannot say that their negligence should subject them to greater liability. It is true the continued clamoring of legatees for their money, and the appearance of trust moneys in the private account of Mr. Thompson, were calculated to awaken inquiry; but, in view of the excellent reputation that Mr. Thompson enjoyed in respect to both his pecuniary ability and

his personal integrity, they lose much of their inculpatory strength. They were better known to the complainant than they were to Messrs. Wilson and Kemble, and they awakened him only to the exaction of the account, with which he was satisfied. When he stopped with exaction of the account he knew that Messrs. Kemble and Wilson did not manage the estate. It would be unjust to say in his behalf that the inquiry of Messrs. Wilson and Kemble, under the circumstances, should have gone further. By acquiescing in the account the complainant did not require further inquiry at that time, and I think he should not now be permitted to object that it was not made. Besides, the proofs fail to show that, if exhaustive inquiry had then been made, anything more could have been saved to the estate than is had through the balance of account to which I hold all the executors.

It was unquestionably the duty of the executors to ascertain the condition of the estate when they assumed its management. Such ascertainment would have disclosed the situation in which the Philadelphia real estate was left, and the necessity of provision for its safety, and would probably have shown that Mr. Thompson was already a defaulter to the testator, and have resulted not only in saving the property from sale, but also in the efficient protection of all the other assets of the estate. The executors were undoubtedly negligent in this respect. But it would be most difficult, I think impossible, to measure the damage that this neglect caused. It is, at best, problematical and remote. The Philadelphia property was sold after Mr. Thompson became the sole representative of the estate in Pennsylvania, and while as such sole representative he was in receipt of its rents, which were more than sufficient to pay the yearly ground rent. It does not appear that the moneys paid by the testator to Thompson to satisfy the ground rent could have been recovered back. It only appears that Thompson would probably, upon the discovery, have been removed from the trust. That is too remote from the losses for practical use.

I think that the balance due from the executors upon the

accounting, with interest upon it, will cover all that can be justly assessed against them because of their negligence.

Against that part of this charge which consists of interest, they must be credited the payments made by Mr. Thompson to the widow and son of the testator, and against that part of it which consists of principal in excess of $10,000 to be reserved in trust for the complainant, they must be credited the legacy of $3,000 paid to the cemetery company, the three legacies of $500 each to Phoebe Rihl and others, and the moneys paid to the two charitable institutions, with interest upon each of those payments from its date.

There must be a reference to a master to state this account.

The bill seeks not only relief against the executors of the will, but also asks that the devise of lots to the Beverly Cemetery Company, in trust in perpetuity, may be decreed to be void, and that the cemetery company may be required to account for moneys realized from such of the lots as it has sold. This matter has no connection with the issue which has been already discussed. It introduces a distinct question not related to that issue. A decision of it at this time will tend to confusion and embarrassment in the future conduct of the suit. Besides, the question concerns the title to lots that have been sold, and the purchasers of those lots have not been made parties to this suit, and, even if sales of the lots by the cemetery company may be adopted by the executors, the position of the defendant executors at this time is such that they are illy fitted to intelligently and deliberately judge whether it is best for the interest of the estate to adopt the sales. No evidence has been produced to enable me to determine this important question for them. Upon such consideration I have concluded, as I intimated at the argument I would conclude, not to decide this part of the case. The pleadings may be amended by striking it out.

The complainant will be entitled to costs against the defendant executors.